UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
TESSEMAE'S LLC, a Maryland Limited
Liability Company,

                 Plaintiff,

-against-

ATLANTIS CAPITAL LLC, a New York
Limited Liability Company, MOHAMMAD
(ALAN) S. RAHMAN, and JOSEPH
BOHANNON,

Defendants.
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/20/2019

**OPINION & ORDER**
18-CV-4902 (KHP)

**KATHARINE H. PARKER, United States Magistrate Judge.**

      Plaintiff Tessemae's LLC ("Tessemae's"), a family-owned business that makes salad

dressing, brought this action against Atlantis Capital LLC ("Atlantis Capital"), its chief executive

officer, Mohammad (Alan) S. Rahman, and Joseph Bohannon, a broker affiliated with Atlantis

Capital, for alleged conversion, fraud, unjust enrichment, and violations of New York General

Business Law § 349.  (ECF No. 12, First Amended Compl. (the "Complaint") ¶ 2.)  Tessemae's

alleges that Defendants extorted improper "finder's fees" from it in connection with facilitating

two financing transactions, the first with Capital Partners Network OT, Inc. ("Capital Partners")

and the second with Bibby International Trade Finance, Inc. ("Bibby").  (*Id.*)  Tessemae's further

alleges that Defendants coerced it into executing a Client Services Agreement (the "CSA")

1

memorializing Tessemae's obligation to pay fees for arranging the Bibby financing. (*Id.* at ¶ 53.) Tessemae's seeks damages of at least $118,403.98, which represents amounts paid to Atlantis Capital, a declaratory judgment that the CSA is null and void, and attorneys' fees and costs. (*Id.* at ¶¶ i-iii.)

Defendants have moved pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, Fed. R. Civ. Pro. 12(b)(1), to dismiss the complaint for lack of subject-matter jurisdiction due to "the existence of a valid Arbitration clause within the Client Services Agreement" and to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2. (ECF No. 31.) Alternatively, Defendants request that this Court order a stay of proceedings pending the result of arbitration. (ECF No. 31-2 at 8.) Defendants also seek to reserve their right to answer the Complaint pending the result of arbitration, as well as attorneys' fees and costs. (*Id.*)

For the reasons set forth below, Defendants' motion to compel arbitration is granted in part and denied in part, and Defendants' request for a stay is granted.

### BACKGROUND

Tessemae's is a small family-owned company based in Maryland that was in financial distress in 2017. (*See* Compl. ¶ 3.) Defendants, who are in business of connecting companies with potential funders, offered to connect Tessemae's with investors and other sources of financing. (*Id.* ¶¶ 2, 19.)

### A. The Capital Partners Financing

In or around August 2017, Defendants proposed that Tessemae's enter into a financing transaction whereby Capital Partners would purchase Tessemae's future receipts. (*Id*. ¶ 20.) Tessemae's ultimately entered into a contract with Capital Partners pursuant to which Capital Partners provided Tessemae's with tranches of funding on September 9, 2017 and September 21, 2017. (*Id.* ¶ 32.) Tessemae's alleges that just prior to the closing of the first tranche of funding, the Individual Defendants demanded that Tessemae's pay them a finder's fee in connection with the Capital Partners transaction in the total amount of $19,990, payable in two installments of $9,995 each. (*Id*. ¶¶ 26-30.) Although the fee had not been a term of the deal as originally presented, Tessemae's paid the fee. (*Id.* ¶¶ 25, 31.) Tessemae's later learned that Atlantis Capital had entered into an Independent Affiliate Agreement with Capital Partners to act as a referral source for Capital Partners, pursuant to which Atlantis Capital would receive a referral fee. The Independent Affiliate Agreement prohibited Atlantis Capital from soliciting, charging or accepting any form of fee or compensation from any account funded by Capital Partners without its prior authorization. (*See id.* ¶¶ 21-23; ECF No. 34-1, Ex. A to Decl. of Lindsay Thomas dated October 10, 2018 ("Thomas Decl.").) The Independent Affiliate Agreement is dated September 11, 2017. (Thomas Decl. Ex. A.)

Tessemae's contends that Defendants improperly demanded the finder's fee on the eve of the Capital Partners financing transaction to exert undue pressure on Tessamae's, which

needed financing, to pay.  Tessemae's further alleges that Defendants wrongfully concealed their agreement with Capital Partners, which would have revealed to Tessamae's that Capital Partners was already paying a referral fee and which prohibited Defendants from charging Tessamae's.  (ECF No. 34, Thomas Decl. ¶¶ 4-15.)

### B. The Bibby Financing

In early September 2017, Defendants introduced Tessemae's to Bibby, which could provide Tessemae's with a $3 million line of credit to be drawn against Tessemae's accounts receivable.  (*See* Compl. ¶ 34; ECF No. 38-3, Ex. A to Defs.' Reply Affirmation ("Defs.' Reply").[1]) The term sheet for the transaction did not include any provision for payment of a finder's fee. (Compl. ¶ 42; ECF No. 34-4, Thomas Decl. Ex. D.)  On September 25, 2017, Tessemae's entered into a Master Purchase and Sale Agreement with Bibby, and Bibby provided the financing on September 28, 2017.  (Compl. ¶¶ 44, 51.)  Tessemae's alleges that, after the Master Purchase and Sale Agreement was signed and on the eve of closing, the Individual Defendants again demanded a finder's fee of $60,000 plus an additional 1% of each invoice funded by Bibby.  (*Id*. ¶¶ 45-46.)  Bohannon instructed Tessemae's to complete ACH authorization forms that would permit Atlantis to directly withdraw the finder's fee payments from Tessemae's bank account and not to send the authorization form to Bibby.  (*Id*. ¶¶ 46-47.)  Tessemae's obliged and

---

[1] Defendants' Reply takes the form of an affirmation by Khalid M. Azam, Defendants' counsel.

provided the authorization forms to Defendants, and Atlantis Capital withdrew $30,000 from Tessemae's bank account on September 28, 2017. *(Id.* ¶¶ 50, 52.) Defendants made other withdrawals totaling $30,000 in October 2017. (*Id.* ¶ 54.)

**C.    *Circumstances Leading to the Signing of the Client Services Agreement***

Tessemae's alleges that it was surprised by Defendants' last-minute demand for a finder's fee in connection with the Bibby transaction. Lindsay Thomas, Tessemae's chief financial officer, called Bohannon shortly after receiving Defendants' demand for a fee, expressing "outrage that Defendants were disclosing the exorbitant Bibby Finder's Fee" on the eve of the closing. (Thomas Decl. ¶ 30.) During that conversation, Tessemae's alleges that Bohannon "threatened to cancel the Bibby Financing if Tessemae's failed to sign the ACH authorization forms [allowing it to withdraw funds from Tessemae's bank account] and pay the Bibby Finder's Fee" and "falsely stated that Rahman was a member of Bibby's board of directors and that he had the power to terminate the Bibby Financing should Tessemae's fail to sign the ACH authorization forms." (*Id.*)

In connection with the instant motion, Defendants deny Tessemae's characterization of what transpired with regard to the CSA. (Defs.' Reply; ECF 38-2, Decl. of Joseph Bohannon dated October 30, 2018 ("Bohannon Decl.") ¶ 5.) Defendants represent that they did not use "strong arm tactics or threats" on the eve of the closing of the Bibby financing; rather, they say they were willing to accommodate Tessemae's by providing for a payment plan for the $60,000

5

finder's fee they were charging.  (Defs.' Reply ¶ 7.)  Defendants have provided a copy of an e-mail from Bohannon to Thomas, dated September 28, 2017 at 4:03 PM, laying out a payment plan for the $60,000 Bibby financing fee.  (*See* ECF No. 38-7, Defs.' Reply Ex. E, at 4.)  The e-mail begins with the following language:  "[p]er our conversation and agreement, please acknowledge receipt of this email as well as this is a binding agreement between Tessamae [sic] & Atlantis Capital regarding one time and recurring compensation for the Accounts Receivable facility established."  (*Id.*)  In her response at 4:46 p.m., Thomas acknowledges receipt of the proposed payment plan and agrees to it.  (*Id.* at 3.)  Defendants also have provided a copy of an e-mail from Rahman to Thomas, dated September 28, 2017 at 5:36 PM, in which Rahman appears to be congratulating Thomas on the closing of the Bibby financing and again lays out the payment schedule for the related $60,000 fee.  (*See* ECF No. 38-8, Defs.' Reply Ex. F, at 2.)  On September 29, 2017, Thomas responds to Rahman's email by saying, "[t]hank you!!  The company is thrilled and very appreciative of your hard work in getting us across the finish line. I've attached [a] signed ACH form corresponding to the initial $30,000 payment."  (*Id.* at 3.)  Defendants argue that this exchange shows that Tessemae's was not the "victim of any exorbitant or unconscionable fee arrangement."  (Defs.' Reply ¶ 5.)

### D.    The Client Services Agreement relating to the Bibby Financing

A few days after the Bibby transaction closed, Defendants presented Tessemae's with the Client Services Agreement ("CSA") memorializing the finder's fee agreement with regard to

the Bibby transaction and reflecting the payment plan discussed in the emails a few days prior. (Compl. ¶ 53.)  The CSA provides that "[a] relationship between Atlantis Capital LLC and Client(s) is created upon execution of this Client Services Agreement by all parties and payment by client9s) of the engagement fee under the terms of this Agreement."  (Defs.' Reply Ex. A, at 3.)  Tessemae's signed the CSA on October 2, 2017.  (Compl. ¶ 53.)  Tessemae's produced a copy of the CSA signed only by Tessemae's executives.  (ECF 34-7, Thomas Decl. Ex. G.)  Rahman submitted a sworn declaration stating that it was signed by Atlantis Capital on October 2, 2017, and Defendants' produced a fully executed CSA with Rahman's signature.  (ECF 38-1, Decl. of Mohammad S. Rahman dated October 30, 2018 ("Rahman Decl."), ¶ 3; Defs.' Reply Ex. A.)  The CSA states that it may be signed in counterparts, and Tessemae's agreed to the language stating "that an email or facsimile copy of the Client Services Agreement with signatures may be treated as an original."  ( Thomas Decl. Ex. G, at ¶ 21.)  The CSA does not contain any provision requiring a counter-signed original of the CSA to be delivered to be valid.

Later that month, Tessemae's accounting firm communicated by email with Rahman, copying Thomas, arranging for the installment payments to be made to Atlantis Capital for amounts due under the CSA.  (ECF 31-1, Ex. C to Decl. of Khalid M. Azam dated September 10, 2018 ("Azam Decl.").)  The authorization forms permitting the payment of installments on October 7 and October 20, 2017 are signed by a representative of Tessemae's.  (ECF 31-4, Azam Decl. Ex. B.)

The CSA contains a dispute resolution clause that mandates that disputes between Atlantis Capital and Tessemae's arising out of the CSA be resolved in arbitration. The provision reads as follows:

> Any dispute, controversy or claim arising or relating to this Agreement or breach thereof, not settled in writing by Client and Company, shall first be set before a competent, professional third party mediator unrelated to Client and Company with the costs for mediation to be born equally by each party. In the event, such dispute, controversy, or claim remains unresolved, it shall be then settled by arbitration held in Atlanta, Georgia in accordance with the rules of the American Arbitration Association then in effect. The arbitrator may grant injunctive relief for monetary relief in such dispute, controversy or claim. The decision of the arbitrator shall be conclusive, final and binding on Client and Company to the arbitration. Judgment of the arbitrator's decision for the benefit of the prevailing party may be entered in any court having jurisdiction thereof. Client and Company shall pay the costs and expenses of such arbitration in such proportions as the arbitrator shall decide. This is construed to include reasonable attorney [sic] fees and any other expenses and charges necessary to adjudicate the controversy. Client and Company understand and agrees [sic] that acceptance of this provision is construed to be a waiver of right to a jury trial.

(Thomas Decl. Ex. G, at ¶ 14.) The CSA also contains a choice of law clause providing that "[t]he validity, interpretation, and legal effect of this Agreement shall be governed by the laws of the Stale of New York." (*Id.* at ¶ 19.)

### E.    *Termination of Relationship with Defendants*

In or about December 2017, Tessemae's learned that Atlantis Capital was party to a Referrer Engagement Agreement with Bibby pursuant to which it was paid commissions for referring customers like Tessemae's and was required to disclose its fee arrangement with Bibby to Tessemae's. (Compl. ¶ 56; *see* ECF No. 34-3, Thomas Decl. Ex. C.) Believing it had

8

been defrauded, Tessemae's terminated its relationship with Defendants on or about January 9, 2018 via email and refused to permit additional funds to be withdrawn from its account or pay Atlantis Capital any additional amounts pursuant to the CSA. (Compl. ¶¶ 56-58; *see* ECF No. 34-8, Thomas Decl. Ex. H.) Additionally, after learning of Defendants' conduct, Bibby terminated its relationship with Defendants. (Compl. ¶ 57.) Tessemae's contends that its termination of its relationship with Defendants constituted a revocation of its acceptance of the CSA. (*Id.* ¶ 58.) The CSA contains a provision governing cancellation of the CSA which states that the "Agreement may not be cancelled or rendered null and void by either Client or Company, with or without cause. Only upon written notice received by either Client or Company at the most recent address of record that all the provisions and terms of this Agreement have been fulfilled may this contract be declared complete and closed." (Defs.' Reply Ex. A, at ¶ 11; Thomas Decl. Ex. G, at ¶ 11).

### F. Defendants' Motion to Dismiss and Compel Arbitration

In June 2018, Tessemae's filed this action for return of the finder's fees paid to Atlantis Capital in connection with the Capital Partners and Bibby transactions, a declaratory judgement that the CSA is invalid and the product of fraud, and its attorneys' fees and costs. In lieu of answering the Complaint, Defendants filed the instant motion to compel arbitration pursuant to the arbitration provision in the CSA and either dismiss or stay this action pending arbitration. The parties appeared for oral argument on the motion on July 29, 2019.

**DISCUSSION**

### I.      *Standard of Review*

When deciding a motion to compel arbitration, courts apply a "standard similar to that applicable for a motion for summary judgment." *Myer v. Uber Techs., Inc.,* 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)).  If a court finds no genuine issue of material fact in dispute as to the formation of the agreement to arbitrate, it may rule on the motion to compel arbitration as a matter of law.  *Id.* ("[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings.") (first alteration in original) (internal quotation marks omitted) (quoting *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund*, 661 F.3d 164, 172 (2d Cir. 2011))).  However, if there is a genuine issue of material fact regarding the formation of the agreement, then "[a] motion to compel arbitration must be dismissed" in favor of conducting further inquiry into the formation of the arbitration agreement specifically.  *Brown v. St. Paul Travelers Companies, Inc.*, 331 F. App'x 68, 69 (2d Cir. 2009) (internal quotation marks omitted) (citing *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir.2003)).  If a court concludes that an agreement to arbitrate exists, "it should then consider whether the dispute falls within the scope of the arbitration agreement." *Meyer*, 868 F.3d at 74 (2d Cir. 2017) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17,

26 (2d Cir. 2002)).  Courts may consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, and draws all reasonable inferences in favor of the non-moving party."  *Meyer*, 868 F.3d at 74 (internal citations and quotation marks omitted).

II.    ***Whether an Agreement to Arbitrate Exists that Covers the Claims in this Action***

Under the FAA, a contract's written provision to arbitrate "a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  In light of the federal policy favoring arbitration, the United States Supreme Court has repeatedly rejected challenges to arbitration agreements and held that "courts must 'rigorously enforce' arbitration agreements according to their terms."  *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (quoting Dean *Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)); *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344-46 (2011); *accord JLM Indus., Inc. v. Stolt-Nielson SA*, 387 F.3d 163, 171 (2d Cir. 2004).

Since "[a]rbitration is strictly a matter of consent," courts must determine whether the parties consented to arbitrate the dispute.  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 300 (2010) (citation and internal quotation marks omitted); *see also id.* at 297 ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute. . . . To satisfy itself that such agreement exists, the court must

resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." (citations and emphasis omitted)). The party moving to compel arbitration "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010). The moving party need not "show initially that the agreement would be *enforceable,* merely that one existed." *Id.* (emphasis in original).

### A. *Whether Atlantis Capital Has Made a Prima Facie Showing of Arbitrability*

Here, Atlantis Capital has met its burden of demonstrating the existence of an arbitration agreement as to some, but not all, of the claims in this action. The CSA between it and Tessemae's contains an arbitration provision that, if enforceable, would govern the claims against Atlantis Capital regarding the finder's fees paid/due with respect to the Bibby transaction. Both parties acknowledge that the CSA memorializes the parties' obligations relating to the Bibby financing. (*See* Thomas Decl. ¶ 35 (Thomas acknowledging that Tessemae's executed the CSA and which Tessemae's describes as seeking "to memorialize their extortive Bibby Finder's Fee."); Defs.' Reply ¶ 6 (Defendants noting that that "[t]he Agreement dated 10-2-2017 was signed by the Plaintiffs [sic] side after the transaction of 3 Million AR Credit Line was done with BIBBY.").) And, the CSA itself states that the fee relates to the $3 million credit facility provided by Bibby. (Thomas Decl. Ex. G, at ¶ 5.) Thus, an agreement to

arbitrate exists between Tessemae's and Atlantis Capital as to the dispute regarding the CSA fees and the validity of the CSA as a whole. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006) ("[T]he issue of the contract's validity is considered by the arbitrator in the first instance.").

In contrast, Atlantis Capital does not provide any showing that an agreement to arbitrate existed with respect to the claims against it related to the Capital Partners transaction. Likewise, the Individual Defendants do not point to any agreement with Tessemae's which requires arbitration of Tessemae's claims against them individually. Therefore, Defendants' motion to compel arbitration is denied as to Tessemae's claims against the Individual Defendants and is also denied as Tessemae's claims against Atlantis Capital relating to the Capital Partners transaction.

### B. *Whether the Agreement to Arbitrate Is Applicable to the Claims Asserted Relating to the Bibby Transaction*

Tessemae's bears the burden of showing the Agreement to be inapplicable or invalid once Atlantis Capital has shown that the CSA contains an arbitration provision. *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.–Alabama v. Randolph,* 531 U.S. 79, 91–92 (2000)). It may do this by showing that: (i) it did not consent to arbitration, (ii) the arbitration agreement is invalid or unenforceable, or (iii) the arbitration agreement does not encompass its claims. *See Green Tree,* 531 U.S. at 91-92; *Application of Whitehaven S.F., LLC v. Spangler*, 45 F. Supp. 3d 333, 342-43 (S.D.N.Y. 2014), *aff'd*, 633 F. App'x

544 (2d Cir. 2015). Tessemae's has admitted that it signed the CSA and that the CSA contains an arbitration provision. It also acknowledges that the claims it asserts related to the Bibby finder's fee fall within the scope of the arbitration provision. That provision provides that any dispute, controversy, or claim arising out of or relating to the CSA or breach of the CSA must be arbitrated. (Thomas Decl. Ex. G, at ¶ 14.) Tessemae's argues, however, that the CSA, and the arbitration agreement within it, is invalid and unenforceable.

The Court first addresses Tessemae's argument that the CSA is unenforceable because it was not properly executed, then addresses Tessemae's contention that the CSA is unenforceable because of its revocation.

Tessemae's argues that the CSA is unenforceable because Atlantis Capital never executed the CSA or delivered it prior to Tessemae's revocation on January 9, 2019. (ECF No. 33, Pl.'s Opp'n at 11-16.) Under New York law, a contract may be enforceable even if not in a signed writing, unless the parties stipulate that the contract must be signed to be binding.[2] The intent of the parties to the contract controls whether the contract must be signed to be binding. *Pers. Watercraft Prod. SARL v. Robinson*, No. 16-CV-9771 (AJN), 2017 WL 4329790, at *5 (S.D.N.Y. Sept. 1, 2017) (citing *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir.

---

[2] The parties do not dispute that New York state contract law governs whether a valid arbitration agreement exists. *See* Pl.'s Opp'n; Defs.' Reply. Further, the CSA contains a choice of law clause indicating that New York law governs the "validity, interpretation, and legal effect" of the Agreement. Thomas Decl. Ex. G, at ¶ 19.

1985)).  There are four factors courts consider when determining whether a verbal agreement or unsigned contract is enforceable, but the existence of a writing showing that one party did not intend to be bound until the agreement is signed is dispositive.  *Kaczmarcysk v. Dutton*, 414 F. App'x. 354, 355 (2d Cir. 2011).  Here, the CSA states in capitalized and boldfaced type that "[a] relationship between Atlantis Capital LLC and Client(s) is created upon execution of this Client Services Agreement *by all parties* and payment by the Client(s) of the engagement fee under the terms of this Agreement."  (Thomas Decl. Ex. G, at 3 (emphasis added).)  Thus, the plain language of the CSA sets forth the parties' intent that it be signed before it becomes enforceable.  Tessemae's admits that it signed the CSA on October 2, 2019.  Atlantis Capital has provided the Court with a fully executed CSA, and Rahman has stated in a sworn declaration that the CSA was countersigned by him for Atlantis Capital on October 2, 2019.  (*See* Defs.' Reply Ex A; Rahman Decl. ¶ 3.)  Further, Defendants' counsel represented to this Court during oral argument that the CSA was signed on the same day.  Beyond the fact that both parties signed the CSA, it is undisputed that Tessemae's authorized payments under the CSA according to the payment schedule in it after signing.  Tessemae's did this in response to emails from Atlantis Capital seeking the payments and discussing that the payments would be accomplished via ACH authorization forms signed by Tessemae's.  (*See* Azam Decl. Ex. B; ECF No. 31-5, Azam Decl. Ex. C; Defs.' Reply Ex. F.)  Thus, both parties' actions after signing confirm that they both intended to be bound by the CSA.

15

Tessemae's states that it never received Atlantis Capital's countersigned copy of the CSA. (Thomas Decl. ¶ 36.) This issue, however, is not material to the outcome of this motion. Nothing in the CSA requires delivery of a countersigned CSA for it to be binding. Rather, the CSA specifies only that it must be signed by both parties. Furthermore, the CSA states that it may be signed in counterparts, and Tessemae's agreed "that an email or facsimile copy of the Client Services Agreement with signatures may be treated as an original." (Thomas Decl. Ex. G, at ¶ 21.) Under long-standing New York law, a contract may be enforceable even if a party's actual written signature on the contract is not *delivered* to the counter-party so long as the party manifested acceptance. *Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 658 (2d Cir. 1996) (noting that a "valid contract requires a manifestation of mutual assent" but does not require delivery; collecting authorities); *Taub v. Hariton*, 1995 WL 373504, at *2 (S.D.N.Y. June 22, 1995) (holding that an offeree must manifest acceptance in order to form a legally operative agreement, but physical delivery of an executed contract is not always necessary; collecting cases); *see also Sarasohn v. Kamaiky*, 193 N.Y. 203, 214 (1908) ("Any evidence that shows that the parties to a written instrument intend that the same should be operative and binding upon them is sufficient in an action to enforce its provisions."). Here, the correspondence between the parties in late September 2017 and in October 2017, in which Atlantis Capital asks for its fee under the CSA and Tessemae's responds by acknowledging the CSA and signing authorization forms for payment of the fee, is evidence of both parties'

acceptance of the CSA.  Indeed, Tessemae's does not challenge the existence of the correspondence or deny that it paid fees under the CSA after its officers signed on October 2, 2017.  Thus, the evidence before the Court demonstrates that there is no genuine issue of fact that the CSA was signed by both parties and that Tessemae's acknowledged that it was enforceable by Atlantis Capital because it paid amounts due under the CSA.

Tessemae's also argues that the CSA is not enforceable because Tessemae's revoked it before receiving the countersigned CSA from Atlantis Capital.  It characterizes its January 9, 2019 email as a "revocation" of its acceptance of the CSA.  (Pl.'s Opp'n at 16 n.4; *see* Compl. ¶ 58.)  Under New York law, an offer generally is not revocable after performance.  *See Evans v. 2168 Broadway Corp.,* 281 N.Y. 34, 40 (1939); Restatement (Second) of Contracts § 42 ("Once the offeree has exercised his power to create a contract by accepting the offer, a purported revocation is ineffective as such.").  Tessemae's purported revocation occurred after Atlantis Capital secured the Bibby financing and after Tessemae's paid the $60,000 finder's fee.  Thus, Tessemae's could not revoke the CSA on January 9 because both parties substantially performed.  Indeed, the CSA states that the finder's fee of $60,000 is earned and non-refundable upon receipt of the $3 million credit facility.  (Defs.' Reply Ex. A, at ¶ 5.)  There is no dispute that Tessemae's received the credit facility prior to signing the CSA and thus agreed that the amount was earned and payable.  There is also no dispute that Atlantis Capital performed its obligation under the CSA by facilitating the line of credit with Bibby.  Tessemae's

acknowledged in emails that Atlantis Capital had performed and that the finder's fee was due

under the terms of the CSA; Tessemae's also paid the finder's fee.  (*See* Azam Decl. Ex. C; Defs.'

Reply Ex. F.)  Thus, the Court finds Tessemae's revocation argument to be without merit.

### C. *Whether the Agreement and Arbitration Provision are Unconscionable*

Tessemae's last argument is that the CSA is procedurally and substantively

unconscionable and it therefore should not be compelled to arbitrate.  If an agreement to

arbitrate exists, courts then must determine whether the terms of the arbitration agreement

are procedurally or substantively unconscionable before compelling arbitration.  *Ragone v. Atl.*

*Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) ("It is clear that questions of

contractual validity relating to the unconscionability of [an] arbitration agreement must be

resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA."

(alteration in original) (citation omitted)); *see also* 9 U.S.C. § 2 (including a saving clause for

contract formation defenses at law and equity).

To evaluate a plaintiff's procedural unconscionability defense, a court must determine

whether the plaintiff lacked a meaningful choice in deciding whether to enter into the

agreement.  *See Desiderio v. National Ass'n of Sec. Dealers,* 191 F.3d 198, 207 (2d Cir. 1999),

*cert. denied,* 121 S. Ct. 756 (2001).  In order to do this, courts consider factors that include

whether deceptive or high-pressured tactics were used, the use of fine print in the contract, the

experience and education of the party claiming unconscionability, and whether there was

disparity in bargaining power. *Am. Family Life Assurance Co. of New York*, No. 18-1960, 2019 WL 3183315, at *1 (2d Cir. July 16, 2019) (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824 (1988)).

Reviewing the parties' submissions in the light most favorable to the nonmoving party, this Court finds that there is insufficient evidence to support a finding of procedural unconscionability. Tessemae's alleges that Defendants deceived it during the contract formation process by failing to disclose that they were going to receive a 10% fee from Bibby as required by the Referral Agreement between Atlantis Capital and Bibby. (*See* Pl.'s Opp'n at 1; Thomas Decl. Ex. C, at ¶ 5(c).) "Mere financial pressure or unequal bargaining power" do not constitute procedurally unconscionable conditions. *Spinelli v. Nat'l Football League*, 903 F.3d 185, 209 (2d Cir. 2018) (internal quotation marks omitted) (quoting *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011)). Assuming Defendants pressured Tessemae's by claiming they would cancel the financing if Tessemae's did not agree to the finder's fee (something Defendants deny), the CSA would still not be procedurally unconscionable. (Thomas Decl. ¶¶ 25, 27-32.) If Tessemae's did not want to pay the finder's fee, it did not have to move forward with the Bibby transaction or, alternatively, it did not have to sign the CSA after the transaction closed. Nothing about the process of Atlantis Capital seeking a finder's fee, modifying the schedule for payment of the finder's fee, and

memorializing the agreement about a finder's fees renders the CSA procedurally unconscionable.

Tessemae's does not argue that the arbitration provision itself is substantively unconscionable. Under applicable law, both procedural and substantive unconscionability are generally required to support a finding that an arbitration provision is unconscionable. *See Gillman*, 534 N.E.2d at 829. Having failed to demonstrate both, the Court finds the arbitration provision to be enforceable. *Id*.

To the extent Tessemae's argues that the CSA itself should be invalidated because it was procured through fraud (i.e., failure to disclose the terms of the Referral Agreement between Atlantis Capital and Bibby), that argument is properly before the arbitrator. The Court's role at this juncture is to determine the existence and validity of the arbitration agreement only, not the validity of the underlying claims about the CSA as a whole.

Where the parties have agreed to arbitrate, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) (emphasis in original) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)). Accordingly, Defendants' motion to compel arbitration is granted as to the issues relating to the Bibby financing between Tessemae's and Atlantis Capital.

### III.    Stay of Proceedings

Under section 3 of the FAA, 9 U.S.C. § 3, a district court "must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding."  *WorldCrisa*, 129 F.3d at 74 (quoting *McMahan Securities Co. L.P. v. Forum Capital Markets L.P.*, 35 F.3d 82, 85 (2d Cir. 1994)).  But, where only some of the claims are arbitrable, courts must determine whether the case also should be stayed as to the non-arbitrable claims.  *See* 9 U.S.C. § 3; *see also Lipford v. New York Life Ins. Co.*, No. 02 CIV. 0092, 2003 WL 21313193, at *4 (S.D.N.Y. June 9, 2003) (" [I]f the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." (quoting *Oldroyd v. Elmira Sav. Bank*, 134 F.3d 72, 75–76 (2d Cir.1998))).  The United States Court of Appeals for the Second Circuit has stated that "[t]he decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket."  *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987); *see also, e.g., White v. Cantor Fitzgerald, L.P.*, 393  F. App'x 804, 808 (2d Cir. 2010) ("[T]he district court is not required to stay the litigation of the nonarbitrable claims before it . . .  pending the outcome of any arbitrated claims.").

In determining whether to issue a stay pending arbitration, "[t]he Court must consider factors such as the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution."  *Maritima de Ecologia, S.A. de*

*C.V. v. Sealion Shipping Ltd.*, No. 10-CV-8134 (DLC), 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011) (citation omitted). Discretionary stays are appropriate where there is a substantial amount of factual overlap between arbitrable claims and claims that cannot be arbitrated. *Winter Inv'rs, LLC v. Panzer*, No. 14-CV-6852 (KPF), 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015); *see also Moore v. Interacciones Glob., Inc.*, No. 94-CV-4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995) ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants."). Stays are warranted where "prior litigation or arbitration is likely to have a preclusive effect" on the claims that may not be subject to arbitration. *Panzer*, 2015 WL 5052563, at *11.

Considering the above factors, the Court finds that a stay pending arbitration is warranted. The claims against the Individual Defendants may be impacted by the arbitrator's determination of whether the CSA was procured by fraud or whether Atlantis Capital breached its representations and warranties under the CSA or committed some other act that warrants return of the Bibby finder's fee. While it is true that the claims relating to the Capital Partners transaction present discrete issues, the Court finds a three-month stay of the action is appropriate to give the parties an opportunity to discuss a global resolution. The CSA requires the parties subject to it to mediate disputes arising under it. (*See* Thomas Decl. Ex. G, at ¶ 14.)

Thus, Tessemae's and Atlantis Capital must attempt to mediate the dispute about the Bibby finder's fee before proceeding to arbitration.  The parties are not prohibited from discussing a global resolution of all claims, and mediation may be the best way to resolve all claims.

**CONCLUSION**

For the reasons set forth above, Defendants' motion to compel arbitration is granted as to the claims against Atlantis Capital pertaining to the Bibby finder's fee but otherwise denied. Defendants' motion to dismiss is denied, but their motion to stay is granted.  The parties shall arrange for mediation by no later than **October 4, 2019**.  The parties shall provide a status letter to this Court by **October 11, 2019** stating whether the mediation occurred and whether any or all of the claims were resolved in mediation.  If the claims are not resolved, the letter shall provide the Court with the schedule for arbitration and state their position as to whether a further stay of this action is warranted.

**SO ORDERED.**

Dated: August 20, 2019
        New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge